**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF GEORGIA**
**SAVANNAH DIVISION**

CTI FOUNDATION TERMINAL, INC.,

Plaintiff,

v.

INGEVITY CORPORATION,

Defendant.

CIVIL ACTION NO.: 4:25-cv-00153

**O R D E R**

Plaintiff CTI Foundation Terminal, Inc. ("CTI"), filed this action for breach of contract against Defendant Ingevity Corporation ("Ingevity"), alleging that Ingevity has breached a three-year storage agreement between the parties by failing to pay multiple monthly storage fees. (Doc. 1.) Plaintiff filed a Motion for Partial Summary Judgment by which it seeks to recover Defendant's total unpaid monthly storage fees, with interest, as of the date the Motion was filed. (Doc. 28.) Defendant likewise filed a Motion for Summary Judgment, arguing that it never breached the parties' agreement and that the Court should dismiss Plaintiff's claims. (Doc. 29.) For the below reasons, Plaintiff's Motion is **GRANTED in part and DENIED in part**, (doc. 28), and Defendant's Motion is **DENIED**, (doc. 29).

**BACKGROUND**

The Court derives the following facts from the parties' submissions and the summary judgment record.[1] (Docs. 1, 28, 29, 32, 33 & 36.) Under Local Rule 56.1, when a fact is

[1] Though both parties filed a statement of undisputed material facts, (see doc. 28-11; doc. 29-1, pp. 4–8), neither party responded to the other's filing. See L.R. 56.1 ("All material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by a statement

undisputed, the Court includes the fact. For disputed facts, the Court reviews the record to determine if a material dispute exists. Where the other party's response reflects the record cited more accurately, the Court modifies the proposed fact and cites the record. The Court also excludes immaterial facts, those stated as an issue or legal conclusion, those not supported by a citation to evidence, or those that the record citation fails to support. And, where appropriate, the Court includes facts drawn from its review of the record. See Williams v. Wal-Mart Stores E., LP, 661 F. Supp. 3d 1264, 1266 (N.D. Ga. 2023). The following facts are undisputed unless otherwise stated.

Plaintiff CTI is a corporation organized under the laws of the State of Georgia that owns and operates liquid and dry bulk storage facilities. (Doc. 1, pp. 1–2; doc. 21, p. 1.) Defendant Ingevity is a corporation organized under the laws of the State of Delaware with its principal place of business in South Carolina. (Doc. 1, p. 1; doc. 21, p. 1.) On April 26, 2024, CTI and Ingevity entered into a Master Terminal Storage Agreement ("MTSA"). (Doc. 1, p. 2; doc. 21, p. 1.) Section 1 of the MTSA describes the agreement's "Purpose" as follows:

> [Ingevity] may engage CTI to store its product at the Terminal . . . . If [Ingevity] engages CTI to store Product, [Ingevity] and CTI will from time to time execute schedules to this Agreement . . . . Each Schedule will reference this Agreement and identify the Product subject thereto and the location, nature, and cost of the usage and/or services to be provided. Once a Schedule is entered into by the Parties, the terms and conditions expressed in this Agreement will govern the services contemplated by the Schedule.

(Doc. 29-2, p. 2.) Section 3 of the MTSA, titled "Rates, Fees and Charges," provides the following terms, in Subsection 3.1, on "Invoicing and Payment,"

> Storage fees will be invoiced in advance on or before the first of the month for which storage applies and will be payable within thirty (30) days after date of such invoice . . . . [Ingevity] will be assessed a late charge of one and one-half percent

---

served by the opposing party."). The Court accordingly draws from the entire summary judgment record to determine the undisputed material facts at issue.

> (1.5%) interest per month (or the highest rate permitted by law, whichever is less) for any invoice not paid within thirty (30) days of the due date.

(Id. at pp. 2–3.) Subsection 3.2, "Escalation," sets forth the process by which the storage fees in a given schedule will increase to reflect market conditions:

> The base month for each Schedule will be the calendar month that is four (4) months prior to the Schedule Effective Date in any particular Schedule (the "Base Month"). Unless otherwise provided in the Schedule(s), on the first anniversary of the Schedule Effective Date provided in the Schedule(s), and each anniversary thereafter, charges in each respective Schedule will be increased (and not decreased) by the percentage of annual change in the Base Month Consumer Price Index, All Urban Consumers, U.S. city average, all items, not seasonally adjusted, U.S. Department of Labor, Bureau of Labor Statistics (the "CPI") or three (3%) percent, whichever is greater.

(Id. at p. 3.) Section 23 of the MTSA, titled "Default," appears as follows:

> **23. Default.**
>
> **23.1** A default under this Agreement (a "Default") by a Party shall occur if it: (a) fails to timely pay any amount which is properly due and payable under this Agreement or any Schedule and fails to cure such non-payment within ten (10) days of notice from the other Party; (b) breaches this Agreement or any Schedule (other than with respect to the payment of money), and the breach is not cured within thirty (30) days of notice, or, where cure of such breach is not possible within such thirty (30) day period but is reasonably capable of being cured, the Party fails to commence cure of such failure within such thirty (30) day period or to diligently, continuously and in good faith pursue such cure; or (c) an "Insolvency Event" occurs, meaning the Party ceases to carry on its business, becomes insolvent or unable to pay its debts as they come due or files or has filed against it a petition in bankruptcy, for reorganization, or for appointment of a receiver or trustee (and in such case when a petition is filed against a Party, the petition is not dismissed within sixty (60) days of the filing). If a Default occurs, the non-defaulting Party may, at its election, pursue any remedies available to it in contract, at law or in equity, and no remedy or election hereunder shall be deemed exclusive but shall, wherever possible, be cumulative with all other remedies in contract, at law or in equity . . . .
>
> **23.2** If a Default occurs, the non-defaulting Party may, at its election, terminate either (a) this Agreement and all Schedules or (b) one or more Schedules with respect to which such Default specifically relates or pertains, without terminating this Agreement and any other Schedule(s).
>
> . . .

> **31. <u>Notices</u>.** To be effective, notices will be in writing and delivered either: (A) by a national overnight transportation company with tracking (e.g., Federal Express, UPS, etc.) (an "Overnight Carrier") to the address set forth below; or (B) by email to the email addresses set forth below . . . .

(<u>Id.</u> at p. 12.)

On April 26, 2024, the same day that the MTSA was executed, CTI and Ingevity also executed "Schedule A," which sets out the terms under which CTI would store one of Ingevity's products (the "Schedule"). (Doc. 1, p. 2.) Section 1 of the Schedule, titled "Term," appears in relevant part as follows:

**SCHEDULE A**

**All terms herein are subject to the Master Terminal Services Agreement noted above.**

| | | |
|---|---|---|
| 1. **TERM:** | Commencement Date | The Commencement Date will be the first of the month following CTI's notice to Customer that the facilities are ready to receive Product, anticipated to be July 1, 2024. The Monthly Tank Storage Charge will be prorated for any partial month that the tanks are placed into service prior to the Commencement Date. |
| | Schedule Execution Date | April 26, 2024 |
| | Schedule Effective Date | May 1, 2024 |
| | Schedule Period | Three (3) years beginning on the Commencement Date (the "Initial Term") and renewing automatically in one (1) year increments (each an "Extended Term") unless cancelled by either party with at least one hundred twenty (120) days' written notice. Such cancellation would be effective at the end of the Initial Term or Extended Term, as the case may be. |

(Doc. 29-3, p. 2.) The Schedule also contains a Section titled "Charges," containing the following relevant excerpt:

| | | |
|---|---|---|
| 5. **CHARGES:** | Monthly Tank Storage | One Hundred Five Thousand Three Hundred Dollars (**$105,300.00**) **per month.** |
| | Estimated Unrecovered Capital Preparation Cost | One Million Five Hundred Five Hundred Thousand Dollars ($1,500,000). |

(<u>Id.</u> at p. 3.)

After the parties executed the MTSA and Schedule (together, the "Storage Agreement"), the "anticipated commencement date" of July 1, 2024, passed without CTI giving Ingevity notice

that CTI's facilities were ready to receive Ingevity's product. (See doc. 33, p. 4; see also doc. 28-4, p. 1.) On August 22, 2024, with still no commencement notice from CTI, Ingevity sent CTI the following "Termination Notice":

> Due to the continuous delays and lack of updates and progress, Ingevity must interpret the situation as [CTI] is unable to fulfill the obligations of our contract. As a result, we hereby notify you that we are terminating the [MTSA] (and any related schedule) with [CTI] effective immediately.

(Doc. 28-3, p. 1; see also doc. 1, p. 4; doc. 21, p. 3.) On August 23, 2024, the day after CTI received Ingevity's Termination Notice, CTI's vice president sent Ingevity a letter titled "Commencement Date" stating,

> Please accept this letter as written notification that [CTI] will be ready to receive product . . . on August 28, 2024. As such, the Commencement Date for Schedule A of our [MTSA] . . . will be September 1, 2024, and the Tank Storage Charge . . . will be . . . invoiced accordingly.

(Doc. 28-5, p. 1; see also doc. 1, p. 4; doc. 21, p. 4.) A few days thereafter, on August 26, 2024, CTI's vice president sent Ingevity another letter stating, in relevant part,

> We have received your notice dated August 22, 2024, purporting to terminate the [MTSA] . . . . We were surprised and disappointed by the contents of your letter without . . . having previously received any notice of default as required under the MTSA.
>
> . . .
>
> We disagree that Ingevity has any basis in the MTSA for termination because [CTI] has performed according to its terms . . . . Therefore, we dispute the validity of the termination notice and will continue to operate under the terms of the MTSA (and related schedules). While [CTI] does not believe it is or has been in default under any provision of the MTSA, we transmitted our Notice of Commencement to you by email on August 23, 2024 . . . . Accordingly, we require that Ingevity perform as required under the MTSA (and related schedules).

(Doc. 28-4, p. 1.) In the time since this exchange, Ingevity has not transmitted any of its product to CTI for storage. (Doc. 1, p. 5; doc. 21, p. 4.) Nevertheless, after sending its notice of commencement, CTI began sending Ingevity invoices in amounts that, according to CTI, reflect

the storage charges set out in the MTSA and Schedule. (Doc. 1, p. 5; doc. 21, p. 4.) Ingevity has not paid any of CTI's invoices. (Doc. 1, p. 5; doc. 21, p. 4.)

On June 26, 2025, CTI filed its Complaint asserting two claims against Ingevity: Count I for breach of contract based on Ingevity's failure to pay storage fees through June 26, 2025; and Count II for attorney's fees pursuant to O.C.G.A. § 13-6-11. (Doc. 1.) In the Complaint, CTI claimed that Defendant Ingevity had failed to pay invoices totaling $964,446.10 plus $70,382.21 in accrued and unpaid interest, with interest accruing at a per diem rate of $475.62. (Id. at pp. 5–7; doc. 21, p. 4.) The parties filed a Joint Motion to Stay Discovery, requesting that the case be stayed pending rulings on their forthcoming motions for summary judgment, which they indicated would "involve[] a threshold question of contract interpretation, the resolution of which will materially impact the scope of discovery and the attendant costs to the [p]arties, and/or which may dispose of the case entirely." (Doc. 26, p. 1.) The Court granted the Joint Motion, (doc. 27), and the parties have since filed dueling motions for summary judgment.

CTI has filed a Motion for Partial Summary Judgment by which it seeks to recover the balance of Ingevity's unpaid monthly storage fees and accrued interest as of the date it filed its Motion (October 10, 2025).[2] (Doc. 28.) Ingevity filed a Response, (doc. 33), and CTI filed a Reply, (doc. 36). Ingevity likewise filed its own Motion for Summary Judgment, arguing that it never breached the Storage Agreement and that the Court should dismiss CTI's claims. (Doc. 29.) CTI filed a Response. (Doc. 32.) The motions are ripe for decision.

[2] In the Motion, Plaintiff states that it "anticipates seeking additional storage charges which accrue subsequent to this motion and its attorney's fees at a later date." (Doc. 28, p. 1.)

## LEGAL STANDARD

Summary judgment "shall" be granted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' if it 'might affect the outcome of the suit under the governing law.'" FindWhat Inv'r Grp. v. FindWhat.com, 658 F.3d 1282, 1307 (11th Cir. 2011) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). A dispute is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

The moving party bears the burden of establishing that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law. See Williamson Oil Co. v. Philip Morris USA, 346 F.3d 1287, 1298 (11th Cir. 2003). Specifically, the moving party must identify the portions of the record which establish that there are no "genuine dispute[s] as to any material fact and the movant is entitled to judgment as a matter of law." Moton v. Cowart, 631 F.3d 1337, 1341 (11th Cir. 2011). When the nonmoving party would have the burden of proof at trial, the moving party may discharge its burden by showing that the record lacks evidence to support the nonmoving party's case or that the nonmoving party would be unable to prove her case at trial. See id. (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986)). If the moving party discharges this burden, the burden shifts to the nonmovant to go beyond the pleadings and present affirmative evidence to show that a genuine issue of fact does exist. Anderson, 477 U.S. at 257.

In determining whether a summary judgment motion should be granted, a court must view the record and all reasonable inferences that can be drawn from the record in a light most favorable to the nonmoving party. Peek-A-Boo Lounge of Bradenton, Inc. v. Manatee Cnty., 630 F.3d 1346, 1353 (11th Cir. 2011) (citing Rodriguez v. Sec'y for Dep't of Corr., 508 F.3d 611, 616 (11th Cir. 2007)). However, "facts must be viewed in the light most favorable to the nonmoving party only

if there is a 'genuine' dispute as to those facts." Scott v. Harris, 550 U.S. 372, 380 (2007). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Id. (citation and emphasis omitted). Additionally, the Court is not permitted to make credibility determinations, weigh conflicting evidence to resolve disputed facts, or assess the quality of the evidence. Reese v. Herbert, 527 F.3d 1253, 1271 (11th Cir. 2008).

## DISCUSSION[3]

Plaintiff CTI argues in its motion that the Court should issue summary judgment in its favor "in the amount of $1,526,646.88." (Doc. 28, p. 1.) Defendant Ingevity's motion, on the other hand, argues that the Court should issue summary judgment dismissing CTI's claims because the claims fail as a matter of law. (Doc. 29.)

### I. The Parties' Cross-Motions for Summary Judgment on the Issue of Breach

In the briefing for both of their Motions, the parties focus almost exclusively on whether, based on the undisputed facts, the Storage Agreement constitutes a valid and enforceable contract requiring Ingevity to pay monthly storage fees. Ingevity admits that it has not made any payments to CTI pursuant to the Schedule.

Under Georgia law, "[t]he elements of a right to recover for a breach of contract are the breach and the resultant damages to the party who has the right to complain about the contract being broken." Budget Rent-a-Car of Atlanta, Inc. v. Webb, 469 S.E.2d 712, 713 (Ga. Ct. App. 1996) (quoting Graham Bros. Constr. Co. v. C.W. Matthews Contracting Co., 284 S.E.2d 282, 286 (Ga. Ct. App. 1981)).

[3] Section 32.5 of the MTSA contains a choice-of-law provision stating that "[t]his Agreement and any Schedule will be governed and construed in accordance with the laws of the State of Georgia." (Doc. 29-2, p. 17.) The Court accordingly applies Georgia law to the parties' dispute.

CTI claims that, when the parties executed the Schedule, they entered into a valid and binding contract—the specific terms of which are set forth in the MTSA and the Schedule—whereby CTI agreed to prepare and provide storage space for Ingevity's product and Ingevity agreed to pay a monthly charge for this storage space for at least an initial term of three years starting on August 24, 2024 (the day CTI gave notice that the facilities were ready to receive the product). (See generally doc. 28.) As of the filing of CTI's Complaint, Ingevity had failed to pay any of the previously-invoiced monthly storage fees (reflected by invoices issued between August 2024 and May 2025), and, as of the filing of CTI's Motion, Ingevity had failed to pay the additional monthly storage fees that had been invoiced and had come due since the filing of the Complaint. (Doc. 1, p. 6; doc. 28, p. 1.) Accordingly, CTI claims Ingevity is clearly liable, under the contractual terms, for all the monthly payments it has failed to pay.

Ingevity's position, however, is that CTI's proposed application of the contract is overly simplistic and fails to take into account several provisions in the MTSA and the Schedule that operated to render the Storage Agreement null (or otherwise unenforceable). (See generally docs. 29, 33 & 37.) Specifically, Ingevity relies on: the (undisputed) fact that the facilities were not ready for storage by the anticipated date listed in the Schedule; the (undisputed) fact that Ingevity has never actually stored any of its product in the storage facilities; and the (undisputed) fact that Ingevity never inspected the facilities and deemed them "clean and suitable."

CTI disputes Ingevity's position as not supported by the plain meaning of the clear and unambiguous terms of the MTSA and the Schedule. (See generally docs. 28, 32 & 36.) Additionally, relying on Section 23, CTI argues that—even if Ingevity believed that CTI had violated the Storage Agreement by not having the facilities ready by the anticipated date listed in the Schedule, and even if Ingevity did not find the facility "clean and suitable"—Ingevity was not

entitled to simply unilaterally terminate the contract (or claim it never took effect); instead, Ingevity was required to give CTI notice of its alleged breach of such requirements and an opportunity to cure. The Court agrees with CTI's arguments and its reading of the MTSA and Schedule.

The interpretation of a contract is a question of law and, "absent ambiguity that cannot be resolved by applying the rules of contract construction," is properly subject to a court's review on summary judgment. Nat'l Hills Exch., LLC v. Thompson, 736 S.E.2d 480, 482 (Ga. Ct. App. 2013) (quoting Huckaby v. Cheatham, 612 S.E.2d 810, 813 (Ga. Ct. App. 2005)). Courts applying Georgia law follow a three-step process to analyze a contract's meaning. Kennedy v. Elec. Ins. Co., No. 4:18-cv-148, 2020 WL 2503146, at *2 (S.D. Ga. Apr. 16, 2020) (citing White v. Kaminsky, 610 S.E.2d 542, 544–45 (Ga. Ct. App. 2004)). "First, the trial court must decide whether the language is clear and unambiguous. If it is, the court simply enforces the contract according to its clear terms." White, 610 S.E.2d at 544 (quoting Woody's Steaks, LLC v. Pastoria, 584 S.E.2d 41, 43 (Ga. Ct. App. 2003)); see also Cont'l Cas. Co. v. H.S.I. Fin. Servs., Inc., 466 S.E.2d 4, 6 (Ga. 1996) ("[U]nambiguous terms of [a contract] require no construction, and the plain meaning of such terms must be given full effect, regardless of whether they might be beneficial to [one party] or detrimental to the [other party]."). Second, "if the contract is ambiguous in some respect," "a jury question does not automatically arise, but rather the court must . . . attempt to resolve the ambiguity by applying the rules of [contract] construction in O.C.G.A. § 13–2–2." White, 610 S.E.2d at 544–45 (quoting Pastoria, 584 S.E.2d at 43). "Finally, if the ambiguity remains after applying the rules of construction, the issue of what the ambiguous language means and what the parties intended must be resolved by a jury [or other factfinder]." Id. (quoting Pastoria, 584 S.E.2d at 43).

The Court has reviewed both the MTSA and the Schedule, paying specific attention to the provisions relied upon by the parties. When the parties executed the MTSA, they established general terms and conditions for any future agreements and contracts (which, per the MTSA, are to be called "Schedules"). (See doc. 29-2.) In executing the at-issue Schedule, the parties entered into an agreement for CTI's preparation and provision of storage space (and other possible services) for Ingevity's crude oil. (See doc. 29-3.) Under the plain and unambiguous terms of the Schedule, that specific Storage Agreement was "effective" on May 1, 2024, but the "Commencement Date"—when CTI would have the facilities ready and available for Ingevity to begin storing its product and, therefore, when Ingevity would start to be charged each month for the storage space—was defined as the first of the month following CTI's provision of notice to Ingevity that the facilities were ready for the product. (Id. at p. 2.) The Schedule states that this date was "anticipated to be July1, 2024." (Id.) The MTSA and the Schedule, however, do not contain any language indicating—and no party has attempted to offer any external evidence—that there was a promise or commitment by CTI, or a requirement imposed upon CTI, to have the facilities ready by July 1. Likewise, there is no provision expressly permitting either party to cancel the Schedule if the facilities were not ready by that date. This was—clearly and unambiguously—simply an "anticipated" (or, in other words, "expected") start date. See "anticipated," Merriam-Webster.com Dictionary, Merriam-Webster, https://www.merriam-webster.com/dictionary/anticipated (accessed Sept. 9, 2026) ("expected or looked-forward to"); see also Akron Pest Control v. Radar Exterminating Co., Inc., 455 S.E.2d 601, 602 (Ga. Ct. App. 1995) ("If the terms used are clear and unambiguous they are to be taken and understood in their plain, ordinary, and popular sense. Dictionaries supply the plain, ordinary and popular sense.").[4]

[4] Some courts and academic commentators have expressed doubt over dictionaries' ability to shed light on the meaning of ambiguous constitutional, statutory, and contractual terms, particularly in the historical

The Schedule defines the "Schedule Period" as three years, beginning on the Commencement Date. (Doc. 29-3, p. 2.) This is the "Initial Term" of the Storage Agreement, and the parties further agreed that, following the expiration of that Initial Term of three years, the Storage Agreement would automatically renew for one-year terms unless a party takes explicitly-described steps to cancel the forthcoming renewal. (Id.) A party can only cancel a forthcoming renewal by giving notice of the cancelation at least 120 days in advance of the end of the current term. (Id.) (In other words, a party can cancel the first automatic renewal by giving notice at least 120 days before the end of the Initial (three-year) Term, and it can cancel any successive auto-renewals by giving notice at least 120 days before the end of the then-underway one-year term.)

Otherwise, pursuant to the clear and unambiguous provisions of the MTSA and the Schedule, once the Schedule became effective on May 1, 2024, the parties were only permitted to unilaterally terminate the Schedule following notice and an uncured default by the other party. The parties agreed to the parameters of this process in Section 23 of the MTSA. (Doc. 29-2, p. 11.) Specifically relevant here, that provision states that a party will be deemed to have "default[ed]" if it "breaches this Agreement or any Schedule (other than with respect to the payment of money), and the breach is not cured within thirty (30) days of notice, or, where cure of such breach is not possible within such thirty (30) day period but is reasonably capable of being cured, the Party fails to commence cure of such failure within such thirty (30) day period or to diligently, continuously and in good faith pursue such cure." (Id.) "If a Default occurs, the non-defaulting Party may, at its election, terminate . . . this Agreement and all Schedules . . . ." (Id.) Thus, the parties expressly agreed (through clear and unambiguous language) that—even where one party believes that the other party has breached the terms of their agreement—rather than being

context. While that criticism is valid in some instances, here, the terms the Court seeks to explain have plain and ordinary meaning in today's time that are reflected by the definitions the Court cites.

able to immediately unilaterally terminate the agreement, that party would provide the other party with notice and a period of time to cure the alleged breach.

It follows, then, that even if the "anticipated" date of commencement stated in the Schedule could somehow be interpreted as a promise or a material term that CTI breached, Ingevity was required, per Section 23.1, to give CTI notice that it considered the delay to be a breach, followed by a 30-day period for CTI to cure (or commence efforts to cure, or diligently, continuously and in good faith pursue such cure). There is, however, no evidence (or assertion by Ingevity) that Ingevity did this. See Pillar Dev., Inc. v. Fuqua Const. Co., Inc., 645 S.E.2d 64, 66 (Ga. Ct. App. 2007) ("Where a contract contains provisions requiring written notice of a claim for breach, '[t]he failure to give notice as required or to show waiver by [the party entitled to notice] is an independent bar to the maintenance of a successful cause of action on the contract.'") (quoting Orkin Exterminating Co. v. Stevens, 203 S.E.2d 587 (Ga. Ct. App. 1973)); see also Caradigm USA LLC v. PruittHealth, Inc., 253 F. Supp. 3d 1175, 1190 (N.D. Ga. 2017) (Where neither of the communications from the party seeking to terminate a contract "gave notice of a material breach, much less . . . [gave] [the other party] a chance to cure," "both [communications] served as notice of [the terminating party's] termination of the Agreement" and "[t]hat jumped the gun and cannot qualify as notice that satisfies the termination clause.").

Accordingly, Ingevity's August 22, 2024, letter purporting to terminate the Storage Agreement was of no effect. By entering into the Schedule with CTI, Ingevity obligated itself to pay—through monthly payments—for storage space for at least three years (with the three-year "clock" beginning to run on the first of the month following the date of notice that the storage facilities were ready for use). Ingevity does not dispute that it has not paid any of the monthly

payments and there is no evidence that it has undertaken any steps (since the August 22, 2024, letter) toward terminating the Storage Agreement.

Ingevity's arguments in opposition to CTI's Motion (and in support of its own summary judgment motion) have no impact on the Court's decision as they are based on interpretations of two MTSA provisions that are not supported by the clear and unambiguous language of those provisions. The Court will address each argument in turn.

First, Ingevity argues that the Storage Agreement cannot be enforced against it because there was a condition precedent that was never satisfied. (Doc. 33, pp. 5–8.) Specifically, Ingevity claims that the language in Section 1 of the MTSA "conditions the applicability of the MTSA itself upon Ingevity's 'engage[ment of] Colonial to store its product at the [Colonial] Terminal.'" (Id. at p. 2.) Ingevity claims this means the "MTSA is purposed to govern the Parties' obligations only '[i]f Ingevity engages Colonial to store [Ingevity's] Product,'" and "[i]t is beyond dispute that Ingevity has never stored any Product at Colonial's terminal." (Id.)

Ingevity's interpretation is incorrect. The relevant portion of Section 1 of the MTSA provides that "[the parties] have entered into this Agreement because [Ingevity] may engage [CTI] to store its product . . . and provide ancillary services. If [Ingevity] engages [CTI] to store Product, [the parties] will from time to time execute schedules to this Agreement which will be attached hereto . . . ." (Doc. 29-2, p. 2.) This language is clear and unambiguous; it simply states that Ingevity may, at some point(s) in the future, involve or hire CTI for the storage of its product and, if such occurs, the parties will execute a schedule. See "engage," Merriam-Webster.com Dictionary, Merriam-Webster, https://www.merriam-webster.com/dictionary/engage (accessed Sept. 9, 2026) (4a. "to provide occupation for: involve," example: "engage him in a new project";

4b. "to arrange to obtain the use or services of : hire," example: "*engage* a lawyer").[5] This language does not condition the creation of a binding contract on whether Ingevity ever actually stores any of its product in the storage facilities after it "engages" CTI to prepare storage space and make it available for Ingevity's use. Thus, to the extent "engagement" can be read as a requirement at all, the undisputed facts show that Ingevity "engaged" CTI and the result of that was (as the MTSA contemplates) that the parties executed a schedule (Schedule A).

Next, Ingevity claims that Section 4 of the MTSA created a condition subsequent and that, because that condition was never fulfilled, the Storage Agreement did not become enforceable. (Doc. 33, pp. 8–11.) Specifically, Ingevity claims that, per Section 4, "the relationship" between the parties did not "continue" (and Ingevity's "obligation to remit Fees" was not "triggered") because Ingevity never affirmatively "accepted" the facilities (by either giving written notice of acceptance or by delivering product to the facilities). (Id. at p. 8 ("Ingevity's 'acceptance' of the Facilities as suitable for its use is a post-formation event that must occur for obligations to become enforceable.").)

Again, Ingevity's proposed interpretation of a provision is contradicted by the clear and unambiguous language of the provision itself. Section 4 merely provided Ingevity the "*option*" of

---

[5] Definition 1 for "engage" is not relevant to the context at hand. It defines the word as "to offer (something, such as one's life or word) as backing to a cause or aim : to expose to risk for the attainment or support of some end," and gives the example "engaged his all in the king's cause." See "engage," Merriam-Webster.com Dictionary, Merriam-Webster, https://www.merriam-webster.com/dictionary/engage (accessed Sept. 9, 2026) (definition 1). Definition 2 likewise is not relevant to the context at hand, as it defines the word as "a. (obsolete) to entangle or entrap in or as if in a snare or bog; b. to attract and hold by influence or power; c. to interlock with : mesh." Id. (definition 2).

Interestingly, Merriam-Webster Dictionary's definition 3. for "engage" is "to bind (someone, such as oneself) to do something[,] *especially*: to bind by a pledge to marry." See id. (definition 3). This terminology further undercuts Ingevity's position that the use of the word "engage" in MTSA Section 1 required some later and further action by Ingevity in order for there to be a binding contract between the parties regardless of the fact that the parties had executed a schedule.

having its representative "inspect the interior of tank(s), pipeline and the remainder of the Facilities for cleanliness and suitability." (Doc. 29-2, pp. 3–4 (emphasis added).) It is undisputed that Ingevity has never exercised this option. While the final sentence of the section states that Ingevity "will be deemed to have accepted the Facilities *as clean and suitable* for the storage of the initial receipt of Product upon the earlier of (1) tendering written notice of acceptance or (2) delivering Product into the Facilities as provided in the Schedule," this clearly is meant to govern Ingevity's ability to later claim the facilities were not "clean and suitable." (Id. at p. 4 (emphasis added).) Nothing about the language of Section 4 indicates that Ingevity may declare the parties' Storage Agreement null or ineffective simply because it declined to exercise its *option* to inspect the facilities. Put another way, Ingevity cannot nullify the parties' agreement or claim that some conditional provision has not been satisfied by electing *not* to inspect CTI's facilities. Under Georgia law, any such conditional provision (precedent or subsequent) would need to be spelled out much more clearly as such. See Choate Const. Co., Inc. v. Ideal Elec. Contractors, Inc., 541 S.E.2d 435, 438 (Ga. Ct. App. 2000) ("Conditions precedent, which are not favored in interpreting contracts, are created by language such as 'on condition that,' 'if,' and 'provided,' or by explicit statements that certain events are to be construed as conditions precedent.") (citing Fulton Cnty. v. Collum Props., 388 S.E.2d 916 (Ga. Ct. App. 1989)); see, e.g., Gen. Steel, Inc. v. Delta Bldg. Sys., Inc., 676 S.E.2d 451, 454 (Ga. Ct. App. 2009) ("The provision at issue in this case employed no explicit words of condition, and there are no expressions in the entirety of the guaranty to the effect that the cited provision is to be construed as a condition precedent. We conclude as a matter of law that the contractual language contained no ambiguity as to whether a condition precedent was created—it did not.").

In sum, in attempting to avoid its payment obligations under the MTSA and the Schedule, Ingevity relies on misinterpretations of clear and unambiguous language within the MTSA that merely gave Ingevity opportunities and options that it could elect to exercise—namely, the opportunity to enter into specific agreements (memorialized in schedules) with CTI for the preparation and provision of storage space, and the option to inspect the facilities before putting them to use. For the foregoing reasons, the Court rejects Ingevity's arguments. The Storage Agreement is valid and enforceable and Ingevity breached the Storage Agreement by failing to make monthly payments. The Court **GRANTS** summary judgment to CTI on these issues. As these arguments also form the basis of Ingevity's Motion for Summary Judgment, the Court **DENIES** that Motion for the same reasons. (Doc. 29.)

## II. The Specific Time Period Subject to Summary Judgment and the Corresponding Damages Amount

CTI, as mentioned above, specifically seeks summary judgment awarding it "$1,526,646.88, which sum represents storage charges of $1,398,282.10 accruing between August 24, 2024 [(the Schedule's "Commencement Date")] and October 10, 2025 [(the date CTI filed its Motion)] as well as $128,364.78 in interest as of October 10, 2025 [(the date CTI filed its Motion)], as provided in the parties' agreement, with interest continuing to accrue at the per diem rate of $689.56." (Doc. 28, p. 1.)

Although Ingevity vehemently argued that it was not obligated to make any of the monthly payments, Ingevity has offered no opposition to CTI's overall calculation of the alleged amount due, much less the claimed amount of interest accruing daily or the application of a 3% increase to the monthly storage rate beginning on the one-year anniversary of the Schedule. (See generally doc. 33; see also doc. 28, pp. 9.)

Notwithstanding the apparent lack of dispute here, the Court is faced with a dilemma: CTI has requested summary judgment—and a damages award—for breaches that have occurred *since* it filed its Complaint (and thus those breaches and the damages arising from them were not alleged in the Complaint). (See generally doc. 1.) CTI's Complaint alleges that Ingevity breached the Schedule by failing to make the payments due between August 24, 2024, and June 26, 2025, and it prays for a corresponding award of "$964,446.10 principal and $70,382.21 in accrued and unpaid interest, with interest accruing at the per diem rate of $475.62." (Id. at pp. 6–7.) CTI attached to its Complaint copies of the unpaid invoices for the monthly storage charges (which were issued on the first of each month, between September 2024 and May 2025) as well as a copy of the default notice it had sent to Ingevity. (See docs. 1-4 & 1-5.) In its summary judgment motion, however, CTI seeks summary judgment that Ingevity has breached the Schedule by failing to pay each monthly payment due through *October 10, 2025*, for which it claims to be entitled to "$1,398,282.10 [principal], as well as $128,364.78 in interest as of October 10, 2025 . . . with interest continuing to accrue at the per diem rate of $689.56. (Doc. 28, p. 1.)

At the summary judgment stage, "the proper procedure for plaintiffs to assert a new claim is to amend the complaint in accordance with Fed. R. Civ. P. 15(a)." Gilmour v. Gates, McDonald & Co., 382 F.3d 1312, 1315 (11th Cir. 2004). "A plaintiff may not amend [its] complaint through argument in a brief opposing summary judgment[,]" id. (citation omitted); see also Petty v. United Plating, Inc., No. CV–09–S–1465–NE, 2012 WL 2047532, *9 (N.D. Ala. May 31, 2012) ("[A] plaintiff cannot assert for the first time at the summary judgment stage a claim for relief that was not plead in his complaint."). CTI has not, however, amended—or even sought leave to amend—its Complaint to add these new allegations of breach. It simply added them in with its summary judgment briefing.

Neither party has cited any authority on the issue of whether the Court may award damages, through summary judgment, for failures to pay that have occurred after the date the Complaint was filed. Each failure to pay could constitute a separate claim, and CTI has not amended the Complaint to add these allegations. In an abundance of caution, the Court declines to grant summary judgment awarding damages for claims that were not asserted in the controlling pleading. Should CTI believe it is entitled to recover damages (through summary judgment) for the breaches occurring after the filing of the Complaint, it may file a motion for summary judgment, with citations to applicable law, within **TWENTY-ONE (21) DAYS** of the date of this Order. Additionally, should CTI seek summary judgment on its remaining claim for attorney's fees, it must file a motion seeking that relief within **TWENTY-ONE (21) DAYS** of the date of this Order. Ingevity shall have **FOURTEEN (14) DAYS** to respond to any filing by CTI. Should CTI not file any pleadings by this deadline, the Court will set this matter down for a status conference.

## CONCLUSION

For the above reasons, the Court **DENIES** Defendant's Motion for Summary Judgment, (doc. 29). The Court **GRANTS** Plaintiff's Motion for Partial Summary Judgment **in part**, (doc. 28), as outlined above, and therefore enters summary judgment in Plaintiff's favor as to Count I of its Complaint, based on the determination that Defendant breached the parties' Storage Agreement by failing to pay the monthly storage fees due between August 24, 2024, and June 26, 2025. The Court awards to Plaintiff the undisputed total amount of unpaid monthly storage charges (with interest) that it requested in its Complaint: $964,446.10 principal and $70,382.21 in accrued and unpaid interest (as of June 26, 2025), plus interest accruing at the per diem rate of $475.62. The Court **DENIES** Plaintiff's Motion for Partial Summary Judgment **in part**, to the extent that it

seeks a judgment awarding it additional amounts for monthly payments that became due and were allegedly not paid between June 27, 2025, and October 10, 2025.

**SO ORDERED**, this 10th day of September, 2026.

R. STAN BAKER, CHIEF JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA